ROBERT SIMMONS CONSTRUCTION
COMPANY et al., Appellants,

v.

The POWERS REGULATOR COMPANY,
Appellee.

Court of Appeals of Kentucky.

Jan. 22, 1965.

As Modified on Denial of Rehearing

June 4, 1965.

Thomas W. Burks, Alexander G. Booth, J. Leonard Walker, Booth, Walker & Allen, Louisville, for appellants.

Samuel Steinfeld, Marvin M. Sotsky, Steinfeld & Steinfeld, Louisville, for appellee.

PALMORE, Judge.

The appellant Simmons was a prime contractor in the construction of Franklin County High School. The appellant National Union is the surety on Simmons's bond to the Franklin County Fiscal Court guaranteeing payment for all labor and materials furnished on the project. Powers, the appellee, supplied to one of Simmons's subcontractors labor and materials for which it has an unpaid bill of $18,602. Simmons and National Union appeal from a summary judgment in that amount granted Powers in its suit against them, the defaulting subcontractor, and the latter's surety.

There are two main questions in the case, one substantive and the other procedural. The substantive question is whether Powers's actions in the handling of its claim against the defaulting subcontractor released the appellant guarantors of their obligation under the bond. The procedural problem is whether there is a genuine issue as to any fact essential to the disposition of the substantive question, hence whether the summary judgment was premature. Cf. CR 56.03.

The prime contract was entered into in June of 1957. Simmons let the plumbing and heating subcontract to Roy C. Dillow, an individual proprietor doing business as Roy C. Dillow Company, and shortly thereafter Dillow placed his order with Powers. In December of 1957 Dillow incorporated as Roy C. Dillow Co., Inc., the corporation assuming all of his business assets and liabilities. Thereafter all of Dillow's work and correspondence were carried on in the name of the corporation.

Powers completed the furnishing of labor and materials in August of 1958, though Dillow had not yet completed his contract with Simmons. On July 10, 1959, Dillow owed Powers a balance of $23,602 and had a claim against Simmons for an unpaid balance of $14,000. At this time a meeting was had in Simmons's office by representatives of Powers, Dillow, and Simmons, resulting in an assignment by the Dillow corporation to Powers of its $14,000 account against Simmons and the subsequent execution, under date of July 15, 1959, of a series of notes from the Dillow corporation to Powers in the principal amount of $9,302, payable over a period of six months from date. Technically, Simmons did not accept the assignment,[1] but there is little doubt that its responsible officers knew of this entire arrangement between Dillow and Powers and, subject at most to its own set-offs against Dillow, tacitly approved of it. The Dillow corporation thereafter paid $1,000 on these notes and Simmons paid $4,000 on the assigned account.[2]

The Dillow corporation was unable to pay on schedule, and in November of 1959 the unpaid notes were destroyed and replaced by a new installment note in the face amount of $8,602, back-dated as of July 15, 1959, and payable over a period beginning January 15, 1960, and ending December 15, 1960. Evidently this transaction also took place in Simmons's office and, according to the deposition of Powers's credit manager, was instigated "at the request of Mr. Simmons and Mr. Dillow in order to ease Mr. Dillow's position." None of the installments called for by the new note were paid, and on May 5, 1960, Powers brought this action against Dillow the individual, Dillow the corporation, Simmons, National Union, and the surety on Dillow's bond.[3]

Simmons's and National Union's answer pleaded that they were released as sureties by reason of Powers's acceptance of the notes and assignment on July 10, 1959, in lieu of Dillow's pre-existing obligation. In the answer it was alleged that Simmons had not acquiesced in or in any way agreed to the transaction.

Following the taking of certain depositions a pre-trial conference was held and various facts were stipulated. It was stipulated also that Simmons and National Union are liable unless released by reason of the notes or the assignment heretofore mentioned. Further facts were developed through requests for admissions. CR 36. Simmons and National Union moved for summary judgment, which was denied. Powers then moved for and was granted a summary judgment against Simmons and National Union.

One of the oldest and best opinions dealing with the obligation of a surety company under a bond similar to the one given by Simmons and National Union in this case is United States Fidelity & Guaranty Co. v. United States, 191 U.S. 416, 24 S.Ct. 142, 48 L.Ed. 242 (1903), in which it was held that the rule of *strictissimi juris,* which originated to protect accommodation endorsers on fixed and precise obligations, does not extend to contracts such as the one in question. Some of the reasoning pertinent to that conclusion reads as follows:

"The guarantor is ignorant of the parties with whom his principal may contract, the amount, the nature, and the value of the materials required, as well as the time when payment for them will become due. These particulars it would probably be impossible even for the principal to furnish, and it is to be assumed that the surety contracts with

---

1. It developed that Simmons had offsetting claims against Dillow for certain failures in performance of the subcontract.

2. This was done by a check payable to the Dillow corporation and Powers, which was endorsed over to Powers.

3. Powers has taken a default judgment against the Dillow corporation. Its claims against Dillow personally and his surety, and cross-claims by the various defendants against each other, had not been adjudicated when the summary judgment (made final pursuant to CR 54.02) attacked on this appeal was entered.

knowledge of this fact. Not knowing when or by whom these materials will be supplied, or when the bills for them will mature, it can make no difference to him whether they were originally purchased on a credit of sixty days, or whether, after the materials are furnished, the time for payment is extended sixty days, and a note given for the amount maturing at that time. *If a person deliberately contracts for an uncertain liability, he ought not to complain when that uncertainty becomes certain.*" (Emphasis added.)

In a later opinion of the late Judge John J. Parker the rule was thus epitomized in a manner hardly susceptible of improvement:

"The law seems well settled that a corporate surety on a contractor's bond is not released from liability to a claimant for labor or materials furnished, by reason of an extension of time of payment granted by the claimant to the contractor, where the extension is bona fide and not in excess of a reasonable, usual, or customary credit." Maryland Casualty Co. v. Ohio River Gravel Co., 20 F.2d 514 (4th Cir. 1927).

Both of the cases from which we have quoted involved a surety company's liability after extensions had been given to its principal, whereas in this case the indulged person was a third party subcontractor. The rule expressed in the Restatement of Security, § 129, as applicable to a contract of this particular nature is that in the absence of an express reservation of rights a binding agreement by the creditor, without the surety's consent, extending the principal's time of payment will release the surety unless he is a compensated surety, in which event he will be discharged "only to the extent that he is harmed by the extension." [4]

We perceive no substantial basis for distinguishing between the compensated surety and the prime contractor who together have undertaken to guarantee payment by third party subcontractors. This contingent liability on the part of the contractor is one of the risks he is paid, as part of the contract price, to assume. He is therefore in fact a compensated surety.

The trial court concluded that without a showing of injury resulting from the transactions between Powers and the Dillow corporation the two sureties, Simmons and National Union, are liable. We would go even further, and take Judge Parker's succinct statement, quoted above, at face value. As we view it, the dispositive factual questions ought to be not only whether the sureties were injured but, if so, whether Powers, the creditor, giving due regard to the interest of the sureties, acted reasonably in its efforts to collect from Dillow.[5] The possibility that Dillow's financial condition might worsen, or the fact that it did, should be merely one of the circumstances bearing on the reasonableness of the creditor's conduct. It is well known in the business world that a debtor limping but still alive is likely to pay a better percentage than a sudden bankrupt.

The more difficult question to decide in this case is whether a summary judgment was in order, as against either or both of the appellant sureties. They take the position that they are entitled to a trial at which they will have the opportunity of attempting to prove that they were injured by Powers's delay in collecting from Dillow, in that Dillow's financial condition was deteriorating in the interim.[6]

With respect to National Union we are of the opinion that this argument is well

---

4. See Kentucky authorities cited in support, Pocket Supplement to Restatement of Security, Kentucky Annotations (1950).

5. Whether the successive notes were or were not intended technically to supplant the original obligation, or to effect a novation, is a question of no material substance.

6. Eventually (during the pendency of this litigation) the ubiquitous Internal Revenue Service swept in and attached such funds, if any, as are owed by Simmons to Dillow.

taken. There is nothing in the record to suggest that National Union ever was advised or consulted in connection with the difficulties encountered in collecting from Dillow, nor, indeed, that it was aware of the substitution of the Dillow corporation for Dillow personally, a transition that seems either to have been ignored or tacitly accepted by Powers and Simmons. Whether National Union should have been put on notice and given a voice in pursuing Powers's claim, and to what avail such an opportunity would have been, are unresolved questions that are material to a determination of whether Powers acted reasonably.

"A party, to be entitled to a summary judgment, has the burden of showing that the facts, which would warrant judgment in his favor under applicable substantive law principles are indisputable. It does not follow from a party's failure to meet that burden, that his adversary has satisfied a similar burden as to the facts which would entitle the adversary to summary judgment." Moore's Federal Practice, R. 56 § 56.13 (Vol. 6, p. 2092).

■ Since the burden of establishing the nonexistence of any genuine issue of material fact is on the moving party, for the purposes of the motion all doubts are to be resolved against him. Rowland v. Miller's Adm'r, Ky., 307 S.W.2d 3, 6 (1956); Clay, Kentucky Practice, CR 56.03, Note 5 (Vol. 7, p. 165). Ordinarily, summary judgment is proper when it is manifest that the opposing party could not strengthen his case at trial and the moving party would be entitled ultimately and inevitably to a directed verdict. Adkins v. Greyhound Corporation, Ky., 357 S.W.2d 860, 862 (1962). There may be instances in which the opposing party, if he has countervailing evidence, cannot hold it back until trial—for example, if it consists of information to which he alone has access. See Moore's Federal Practice, R. 56, § 56.15 [5] (Vol. 6, p. 2144 et seq.). But that situation cannot arise unless and until the moving party has properly shouldered the initial burden of establishing the apparent non-existence of any issue of material fact. Id., p. 2153. It is clear that one party cannot compel the other to try his case on a motion for summary judgment. Clay, Kentucky Practice, CR 56.03, Note 5 (Vol. 6, p. 166); Payne v. Chenault, Ky., 343 S.W.2d 129, 132–133 (1960).

■ We hold that the facts thus far developed in this case do not foreclose the material issues of whether Powers, having due regard for the interest and position of National Union, acted reasonably in its efforts to collect the Dillow account and, if so, whether National Union was thereby injured.

The posture of Simmons is quite different. Simmons was on the scene, dealing with Dillow every day. When Powers's contract with Dillow was completed there was still work to be done by Dillow under his contract with Simmons. Though Simmons did not "accept" the $14,000 assignment, it was well aware that Powers was looking to Dillow's account against Simmons as a substantial source of collection from Dillow. Simmons had the first and best knowledge that Dillow's work was not satisfactory and was giving rise to set-offs against the balance that would otherwise have been payable to Dillow under their contract. If Dillow's financial condition was deteriorating, Simmons must have been as well aware of it as was Powers. Clearly Simmons knew of the first series of notes and did not object or suggest any other course of action. The cancellation of these notes and substitution of the new installment note in November of 1959, resulting at worst in a delay of six months in filing suit, was accomplished, according to undisputed testimony, in Simmons's office. Certainly the status of the Dillow-Simmons account lay at the very heart of Powers's plans and efforts to collect from Dillow, and Simmons's assistance and cooperation were actively sought by Powers all along the way. Had Simmons desired that Powers

close in on Dillow we think it was incumbent on Simmons to say so at the time.

■ As to Simmons, it is our conclusion that the reasonableness of Powers's handling of its claim against Dillow is so manifest as to preclude the possibility of a successful defense by Simmons. Hence the summary judgment against Simmons was proper.

■ It is further contended by Simmons that the trial court abused its discretion in determining that there was "no just reason for delay" and in making the judgment against it final under CR 54.02 while numerous other related controversies remained unresolved. We agree that the power of the trial court under this provision is not unlimited. However, we do not observe any prejudice to Simmons in this instance. Its liability does not depend on any of the remaining issues. Neither does the determination of priorities as between Simmons and other defendants who also have been or may be held liable to Powers require that all the liabilities be adjudged at one and the same time.

To the extent that judgment is granted against National Union the cause is reversed for further proceedings consistent with this opinion; to the extent that judgment is granted against Simmons it is affirmed.