LYNDON PROPERTY INSURANCE
COMPANY, Plaintiff–Appellant,

v.

EASTERN KENTUCKY UNIVERSITY;
Southern Illinois University; South-
ern University; Bernard Katz, as Liq-
uidating Supervisor for Wallace's
Bookstores, Inc., Defendants–Appel-
lees.

No. 05–5552.

United States Court of Appeals,
Sixth Circuit.

Aug. 25, 2006.

Before: MOORE and GIBBONS, Circuit Judges; and SHADUR, District Judge.[*]

JULIA SMITH GIBBONS, Circuit Judge.

Wallace's Bookstores, Inc. ("Wallace's"), formerly a major operator of college bookstores, contracted to operate the campus bookstores of defendants-appellees Eastern Kentucky University ("EKU"), Southern University ("Southern"), and Southern Illinois University ("SIU"). Each contract required Wallace's to post a surety or performance bond. Appellant Lyndon Property Insurance Co. ("Lyndon") provided each of these bonds, which secured the obligations of Wallace's to the colleges pursuant to the underlying contracts.[1] With regard to each of these bonds, the surety was Lyndon, the principal was Wallace's, and the obligee was the particular college defendant.

After Wallace's filed bankruptcy proceedings, each college informed Lyndon of its intent to collect on the surety bond for monies owed to it by Wallace's pursuant to the underlying contract. Lyndon then initiated an adversary proceeding against the three college defendants, asserting that the colleges' failure to provide adequate notice to Lyndon that Wallace's had previously defaulted on the underlying contracts precluded the colleges from collecting on the surety bonds. The college defendants counterclaimed against Lyndon for the amounts owed on the bonds. The bankruptcy court granted judgment for the colleges on their counterclaims against Lyndon. In a separate order, the bankruptcy court also approved, over Lyndon's objections, a settlement of a disputed matter that had existed between Wallace's and one of the college defendants. Lyndon appealed both the bankruptcy court's grant of judgment to the college defendants and its approval of settlement. The district court affirmed both orders, and Lyndon now appeals to this court. For the following reasons, we affirm.

I.

A. EKU

Wallace's contracted with EKU on May 24, 2000, to operate EKU's campus book-

---

[*] The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

1. Throughout this opinion, the underlying agreements between the colleges and Wallace's are referred to as "contracts," and the surety agreements are referred to as "bonds."

store. Pursuant to the terms of the contract, Wallace's was required to make minimum monthly commission payments to EKU, purchase EKU's existing bookstore inventory, and install capital improvements valued at $750,000. At the expiration of the contract, EKU or its designee was to buy back the then-existing inventory and reimburse Wallace's for any unamortized portion of the capital improvements.

Pursuant to the contract with EKU, Wallace's was required to purchase a surety bond in the penal sum of $500,000. Wallace's did so through Lyndon, which issued performance bond No. CSB 2300976. The bond provides that upon notice of Wallace's default by EKU, Lyndon may: (1) indemnify EKU for the cost of completion, (2) remedy the default, (3) complete the contract, or (4) arrange for completion of the contract. The bond also requires EKU to send copies to Lyndon of any cure notices that EKU sends to Wallace's. The bond expressly incorporated the contract between EKU and Wallace's. The contract provides that, in the event of either party's failure to perform, the aggrieved party shall provide thirty days notice to the other party to cure the defect or the contract shall terminate at the aggrieved party's option. Finally, the contract provides that, if EKU determines Wallace's to be in breach of the contract, it shall declare Wallace's in breach and may terminate the contract.

Wallace's failed to pay EKU for the original bookstore inventory or to remit to EKU any monthly commission payments pursuant to the contract from July through December 2000. Wallace's did begin construction of the capital improvements. On January 19, 2001, EKU sent Wallace's a letter in which, invoking the contract, it demanded payment for the past commission payments and the bookstore inventory. On January 25, 2001, Wallace's issued a check to EKU in the sum of $902,430.84 as partial payment for the demand in the January 19 letter (the "January payment"). EKU accepted this payment in forbearance of its right to terminate the contract.

## B. Southern

Beginning in 1990, Wallace's contracted with Southern to operate Southern's campus bookstore, and then extended the contract through a series of renewals. The contracts at issue here required Wallace's to make minimum payments to Southern and make capital improvements. Upon termination, Southern or a subsequent contractor was to reimburse Wallace's for the unamortized portions of the capital investment. The contract also provided that, upon termination, Wallace's agreed to sell the then-existing bookstore inventory at cost.

Under the relevant Wallace's–Southern contracts, Wallace's was required to purchase two surety bonds, in the penal sums of $60,000 and $150,000, respectively. Wallace's did so through Lyndon, which issued performance bonds Nos. CSB 0165837 and CSB 3400595. Like the EKU bond, the Southern bonds outline Lyndon's rights in the event of Wallace's default and require that any cure notices that Southern sends to Wallace's must be copied to Lyndon. The bonds incorporate the contracts between Wallace's and Southern. Those contracts provide that Southern shall provide Wallace's notice of default of any obligations under the contract and shall provide Wallace's an opportunity to cure when Wallace's is in default.

Over the years covered by these contracts, Wallace's routinely made late payments to Southern. Southern continuously accepted these payments and at no time prior to Wallace's bankruptcy filing did Southern place Wallace's in default. On November 27, 2000, and again on January

16, 2001, Southern wrote to Wallace's about outstanding payments due. These letters were not copied to Lyndon.

## C. SIU

On June 2, 2000, Wallace's contracted with SIU to operate its campus bookstore. The contract provided for Wallace's to make minimum payments to SIU. Wallace's was required to purchase a surety bond in the penal sum of $310,000. Wallace's did so through Lyndon. The bond contains no obligation that SIU notify Lyndon if Wallace's failed to meet its obligation under the contract. The bond incorporated the contract. The contract requires that, in the event that one party fails to perform, the other party must provide notice and an opportunity to cure to that party; the contract does not require notice to the surety.

Wallace's made the first two monthly payments to SIU and paid SIU for the value of the existing bookstore inventory. Wallace's then fell behind on its obligations, missing three months of payments and failing to complete required capital improvements. By letter dated November 6, 2000, SIU informed Wallace's that it was withholding payment owed to Wallace's until there was a resolution of past amounts due. SIU did not copy Lyndon on this notice. In December 2000, Wallace's paid SIU for past monthly commissions due.

## D. Wallace's Bankruptcy

Wallace's declared bankruptcy by filing a petition under Chapter 11 on February 28, 2001. Wallace's was subsequently unable to develop a plan of reorganization. The bankruptcy court developed a plan for the sale of Wallace's assets. In a series of orders issued in April and May 2001, the bankruptcy court approved the auction and sale of the assets of the Wallace's bookstore of each of the three college defendants. Pursuant to these orders, Barnes & Noble ("B & N") purchased the bookstore inventory of EKU, and Follet Corporation ("Follet") purchased the bookstore inventory of Southern and SIU. Also pursuant to these orders, the bankruptcy court rejected and terminated the underlying contracts between Wallace's and the college defendants. EKU, without consulting Lyndon, then entered into an operating agreement with B & N. Southern and SIU, without consulting Lyndon, then likewise entered into operating agreements with Follet.

Each college defendant then filed a proof of claim under the Lyndon bonds. On March 26, 2002, Lyndon initiated an adversary proceeding by filing a complaint that, after amendment, named the three colleges and Wallace's as defendants. Each college defendant then filed an answer and counterclaim against Lyndon. The counterclaim of each college defendant alleged that, as a result of Wallace's breach of the underlying bookstore contract, Lyndon owed the college money pursuant to the performance bond that Lyndon had issued. Lyndon then filed answers, as well as a second amended complaint. Defendant SIU later filed an amended counterclaim. Bernard Katz ("Katz"), the liquidating supervisor for Wallace's, was substituted as a party in the adversary proceeding. Prior to trial, Katz filed a motion for summary judgment, which the district court granted on September 4, 2002, thereby dismissing Katz as a party defendant. The adversary proceeding involving Lyndon and the college defendants was tried to the bankruptcy court in two parts, on October 30, 2002, and May 8, 2003. On December 30, 2003, the bankruptcy court granted judgment to each of the college defendants on their counterclaims based on the Lyndon bonds.

In a related action, as part of the underlying Chapter 11 proceeding, Wal-

lace's/Katz claimed that its January payment to EKU of $902,000 was a preferential transfer. EKU and Lyndon denied that the January payment constituted a preference. Wallace's/Katz and EKU resolved this preference claim, jointly submitting to the bankruptcy court a settlement agreement regarding the preference claim on October 31, 2003. Under that agreement, EKU would pay the estate of Wallace's $825,000 and receive an approved claim of $360,222.84, for which it would repay 30% of the funds received up to a maximum of $108,066.85 to the estate. Lyndon objected to the settlement. On December 23, 2003, the bankruptcy court overruled Lyndon's objection and approved the Wallace's/Katz–EKU settlement.

Lyndon timely appealed both the bankruptcy court's grant of judgment to the college defendants on their respective counterclaims and its approval of the EKU–Katz settlement.[2] The district court affirmed the bankruptcy court's orders. Lyndon now appeals to this court.

## II.

When appeal is taken from the district court's final order in a bankruptcy case, we must independently review the bankruptcy court's decision. *In re Kennedy,* 249 F.3d 576, 579 (6th Cir.2001). We review the bankruptcy court's findings of fact for clear error and its conclusions of law *de novo. Id.* The bankruptcy court's approval of a settlement is reviewed for an abuse of discretion. *See In re Monus,* 63 Fed. Appx. 215, 216 (6th Cir.2003); *In re Bard,* 49 Fed.Appx. 528, 530 (6th Cir.2002). We

first review the bankruptcy court's grant of judgment in favor of each college defendant and then review its approval of the settlement between Wallace's and EKU.

### A. EKU

Lyndon makes three arguments challenging the bankruptcy court's award of judgment in favor of EKU. First, Lyndon argues that it should be excused from its obligations under the surety bond because EKU failed to provide notice to Lyndon of Wallace's default as the bond required. Second, Lyndon claims that EKU waived its claim under the bond because it hired a replacement contractor without notifying Lyndon. Third, Lyndon argues that EKU did not have a valid claim under the bond because EKU actually owed Wallace's more money that Wallace's owed EKU.

We turn first to the issue of whether EKU failed to provide Lyndon with notice of Wallace's default. Lyndon argues that EKU's failure to copy Lyndon on its January 19 letter sent to Wallace's or to promptly declare Wallace's in default constituted a material breach of the bond and thereby eliminated Lyndon's liability under the bond. If such notice had been received, Lyndon claims that it could have taken action to avoid any harm from Wallace's default.

■ Wagree with the bankruptcy court's decision that, prior to Wallace's bankruptcy filing, EKU acted reasonably and was not in material breach of the surety bond issued by Lyndon. Although the bond required that EKU inform Lyndon if Wallace's defaulted on its obligations

---

**2.** Lyndon's notice of appeal undoubtedly appeals the judgments in favor of the college defendants. With regard to Katz, however, the notice of appeal appears to reference the bankruptcy court's summary judgment in favor of Katz and Katz's corresponding dismissal from the adversary proceeding, as opposed

to the bankruptcy court's approval of the EKU–Wallace's/Katz settlement. Both Lyndon and the district court nevertheless treat the appeal as challenging the bankruptcy court's approval of settlement; we shall do the same.

and that EKU copy Lyndon on any cure notices, it is well settled that "[o]bligations imposed for the benefit of a paid surety will be construed most strongly against it." *United Bonding Ins. Co. v. Sperry & Hutchinson Co.*, 465 S.W.2d 291, 293 (Ky. 1971). Moreover, as the Supreme Court of Kentucky has stated, the reasonableness of the parties' conduct should be considered when determining whether a paid surety will be excused from its obligations:

> As we view it, the dispositive factual questions ought to be not only whether the sureties were injured but, if so, whether [ ] the creditor, giving due regard to the interest of the sureties, acted reasonably in its efforts to collect from [the principal]. The possibility that [the principal]'s financial condition might worsen, or the fact that it did, should be merely one of the circumstances bearing on the reasonableness of the creditor's conduct. It is well known in the business world that a debtor limping but still alive is likely to pay a better percentage than a sudden bankrupt.

*Robert Simmons Constr. Co. v. Powers Regulator Co.*, 390 S.W.2d 901, 904 (Ky. 1965) (footnote omitted). In this case, EKU elected not to terminate its contract with Wallace's when Wallace's failed to make timely payments. Instead, EKU worked through the deficiency by writing a letter, accepting payment in satisfaction of the debt, and continuing with the contract. EKU did not consider Wallace's to be in default after receiving payment in January. The bankruptcy court found that EKU needed to continuously operate its campus bookstore for its student body and that Wallace's never ceased operating the bookstore. Considering that "[s]erious legal consequences attend a 'declaration of default'" *L & A Contracting Co. v. Southern Concrete Services, Inc.*, 17 F.3d 106, 111 (5th Cir.1994), EKU acted reasonably in treating Wallace's late payment as a minor breach not requiring a declaration

of default or notice to Lyndon. In *L & A Contracting*, on which Lyndon relies, the Fifth Circuit examined the legal nature of the default that is required before an obligee's claim against the surety matures:

> Although the terms "breach" and "default" are sometimes used interchangeably, their meanings are distinct in construction suretyship law. Not every breach of a construction contract constitutes a default sufficient to require the surety to step in and remedy it. To constitute a legal default, there must be a(1) material breach or series of material breaches (2) of such magnitude that the obligee is justified in terminating the contract. Usually the principal is unable to complete the project, leaving termination of the contract the obligee's only option.

*Id.* at 110 (footnotes omitted). Applying these principles to the case at hand, we agree with the bankruptcy court that Lyndon's obligations under the bond should not be excused because EKU reasonably determined that Wallace's had not defaulted on its obligations.

We also agree with the bankruptcy court's conclusion that Lyndon's knowledge of the bankruptcy proceedings precludes Lyndon's notice defense. Any lack of notice to the surety must be the proximate cause of the surety's injury in order to excuse the surety from its bond obligations. *See Robert Simmons Constr.*, 390 S.W.2d at 904 ("[T]he creditor, without the surety's consent, extending the principal's time of payment will release the surety . . . only to the extent that [the surety] is harmed by the extension.") (quotation omitted); *see also United Bonding*, 465 S.W.2d at 294. The bankruptcy court found that Lyndon had notice, possibly as early as February 2001, that Wallace's had filed for bankruptcy. Despite such notice, Lyndon took no steps to protect itself.

Because it had actual notice of the bankruptcy, Lyndon was not proximately harmed by any failure to receive notice of default.

Although Lyndon argues that EKU's failure to notify it of Wallace's late payments thereby voided the bond, the cases on which it relies do not support this position. In *Dragon Construction, Inc. v. Parkway Bank & Trust,* the obligee failed to declare the principal in default and subsequently hired a successor company to complete the principal's contracted performance. 287 Ill.App.3d 29, 222 Ill.Dec. 648, 678 N.E.2d 55, 58 (1997). The *Dragon* court, in granting judgment for the surety, based its decision that the surety was excused from performance on the fact that the obligee did not provide notice to the surety of "[the principal]'s termination [of the contract] and [the obligee]'s hiring of a successor contractor." *Id.* In this case, however, there was neither a termination of the underlying contract nor a hiring of a successor contractor prior to Wallace's bankruptcy filing. Instead, EKU reasonably believed that no default had occurred. Likewise, although Lyndon relies on *L & A Contracting,* we have already noted that the case actually favors EKU's position. In *L & A Contracting,* the court determined that the surety was excused from performance under the bond because the obligee did not provide clear notice of the principal's default to the surety as required by the bond. *See* 17 F.3d at 111. There was no dispute in *L & A Contracting* that the obligee had considered the principal to have been in default; rather, the question was whether the obligee had provided the surety (and the principal) with a sufficiently clear statement that the principal was in default. *See id.* Here, EKU did not consider Wallace's to be in default, so the sufficiency of the notice is immaterial. *See id.* at 109 (stating that surety is liable "only if two conditions exist. First, [the principal] must have been in *default* of its performance obligations under the [ ]contract. Second, [the obligee] must have *declared* [the principal] to be in default."). In sum, the cases cited by Lyndon do not call the bankruptcy court's decision into question.

■ Lyndon next argues that EKU's contracting with B & N for operation of its bookstore precludes EKU's recovery on the bond. According to Lyndon, EKU was required to allow Lyndon the opportunity to complete the contract or otherwise step into the shoes of Wallace's. Lyndon neglects to consider, however, that EKU's contractual relationship with B & N arose from the bankruptcy proceedings, of which Lyndon had notice and in which Lyndon could have sought to participate. A surety that has notice of the bankruptcy proceedings and an opportunity to participate cannot later claim that it is excused from its obligations. *See Kentucky Ins. Guar. Ass'n v. Dooley Constr. Co.,* 732 S.W.2d 887, 888 (Ky.Ct.App.1987). In short, because EKU contracted with B & N after Lyndon had notice of the bankruptcy proceedings and did not seek to participate, Lyndon cannot now claim that the contract with B & N excused its obligations under the bond.

Finally, Lyndon argues that EKU was precluded from asserting claims against Lyndon on the surety bonds because EKU actually owed Wallace's more money than Wallace's owed Lyndon at the time of the bankruptcy filing. In other words, Lyndon attempts to take advantage of the "setoffs" that existed between Wallace's and EKU at the time of the bankruptcy filing. Specifically, Lyndon claims that EKU's claim of damages should be reduced by the value of the then-existing bookstore inventory and any unamortized capital improvements, which it claims EKU was required to purchase from Wallace's at the termination of the bookstore

contract. The bankruptcy court rejected Lyndon's claim for setoff. The bankruptcy court rested its denial of Lyndon's setoff claim on the alternative grounds that either setoff is not available to a surety or, even if setoff was available, the payment by B & N to Wallace's for the inventory and the capital improvements defeated the setoff.

Section 553 of the Bankruptcy Code, 11 U.S.C. § 553, gives a creditor the right to setoff any debts it owes to the debtor against its own claim against the debtor. To meet the requirements for setoff, the offsetting obligations must be mutual and must have arisen prepetition (i.e., before the bankruptcy filing). *See Kentucky Cent. Ins. Co. v. Brown* (*In re Larbar Corp.*), 177 F.3d 439, 445 (6th Cir.1999); *United States v. Gerth,* 991 F.2d 1428, 1430–31 (8th Cir.1993). Although § 553 speaks in terms of the creditor's right of setoff, the debtor has the right to assert setoff as well. *See, e.g., In re Braniff Airways, Inc.,* 42 B.R. 443, 447–48 (Bkrtcy.N.D.Tex.1984); *In re Standard Furniture Co.,* 3 B.R. 527, 531 (Bkrtcy. S.D.Cal.1980). Moreover, when a debtor is insolvent and its surety is made to pay on its debts, the surety has an equitable right to assert a setoff of the amount owed by the creditor to the debtor from the amount owed by the debtor to the creditor. *See In re Eastern Freight Ways, Inc.,* 577 F.2d 175, 180 (2d Cir.1978); *In re Yale Exp. System, Inc.,* 362 F.2d 111, 114–15 (2d Cir.1966); *United States ex rel. Johnson v. Morley Constr. Co.,* 98 F.2d 781, 790 (2d Cir.1938); *American Surety Co. of New York v. City of Akron,* 95 F.2d 966, 969–70 (6th Cir.1938); *Clark Car Co v. Clark,* 48 F.2d 169, 170 (3rd Cir.1931); *Fid. & Deposit Co. of Md. v. Duke,* 293 F.

661, 664–65 (9th Cir.1923); *cf. In re Larbar Corp.,* 177 F.3d at 445–46; *Merritt Commercial Sav. & Loan, Inc. v. Guinee,* 766 F.2d 850, 854–55 (4th Cir.1985). Thus, Lyndon should have been able to claim any setoff existing between Wallace's and EKU, and the bankruptcy court's first basis for rejecting Lyndon's setoff argument was erroneous.

■ The bankruptcy court also held, however, that even if setoff was available to Lyndon as a defense to EKU's counterclaim, EKU did not owe the debt claimed by Lyndon. We agree. The underlying contract between EKU and Wallace's provided that, at termination of the contract, EKU "or its designee" was required to buy back the then-existing bookstore inventory and reimburse Wallace's for any unamortized portions of the capital improvements. B & N, as EKU's designee, was therefore able to buy the inventory directly from Wallace's and reimburse the unamortized portions of the capital improvements directly to Wallace's, without EKU incurring any debt or obligation to Wallace's. For those reasons, although setoff was available to Lyndon in theory, Lyndon mischaracterizes the value of the setoff as including those payments that B & N, as the subsequent operator, made directly to Wallace's. In short, EKU had no existing debt to Wallace's based on the bookstore inventory.[3]

### B. Southern

Lyndon makes two arguments with regard to district court's award of judgment in favor of Southern. First, Lyndon argues that Southern's failure to copy Lyndon on its November 27 and January 16 letters to Wallace's and its failure to de-

---

**3.** Moreover, Lyndon cannot claim that any debt on these terms existed at the time of the bankruptcy filing because at that time Wallace's retained its inventory. The sale of the

inventory came about only when the bankruptcy court ordered the sale. The alleged debts were therefore not prepetition.

clare Wallace's in default excuse Lyndon's liability under the performance bond. For the reasons set forth in Section II.A., we reject this argument.[4] Second, Lyndon argues that it should be able to take advantage of the setoff between Wallace's and Southern. According to Lyndon, when setoffs are properly calculated and the value of the bookstore inventory and the unamortized portion of the capital improvements are considered, Southern was actually a net debtor to Wallace's. As with the EKU contract, however, the Southern contract references reimbursement to Wallace's at termination by "the University or a subsequent contractor." Follet was the subsequent contractor who paid the amount due directly to Wallace's. As in the case of EKU, Southern never owed a debt to Wallace's for the inventory or unamortized capital improvements. Thus, there was no debt upon which Lyndon might claim a right to setoff.

### C. SIU

■ Lyndon makes four arguments with regard to SIU, which we discuss in turn. Lyndon first argues that SIU's failure to copy Lyndon on its November 6 letter to Wallace's and its failure to declare Wallace's in default excuse Lyndon's liability under the performance bond. We reject this argument for the reasons stated in section II.A.[5] Second, with regard to only the SIU bond, Lyndon also argues that the bond only covers Wallace's construction and remodeling activities at the bookstore, not Wallace's ongoing operation of the bookstore. Thus, according to Lyndon, SIU's claimed losses associated with the operation of the bookstore are not covered by the bond. We agree with the bankruptcy court's decision that the language of the bond, when read with the incorporated contract, covered the operation of the bookstore. Although there is certainly language in the bond that references "construction" activity, the "work designated" in the bond is the "lease of the University Bookstore." Moreover, the incorporated contract between SIU and Wallace's governs the operation of the bookstore. Third, Lyndon argues that SIU did not establish its claim for lost profits and that the bankruptcy court's estimate of lost profits for the two years remaining on the bond was speculative. The bankruptcy court found that the lost profits were not speculative and could be calculated with sufficient probability. The bankruptcy court's estimate of lost profits was not erroneous in light of the testimony and stipulations. Finally, with regard to SIU, Lyndon challenges a portion of the bankruptcy court's award to SIU of $129,272.96 in prepetition commissions and expenses. Specifically, Lyndon claims that $36,767.51 of these expenditures came from "secondary arrangements" not covered by the contract or bond. The bankruptcy court found that these secondary expenditures were operational expenditures and thereby covered. Lyndon has not provided any basis on which we might find that this decision was erroneous.

---

4. We find additional support for our holding with regard to Southern in two respects. First, the November 27 and January 16 letters that Southern sent to Wallace's were not cure notices. Both letters simply ask for Wallace's "help" to clear up overdue payments. Second, Southern's course of conduct of continually accepting late payments by Wallace's underscores that it did not consider Wallace's to be in default.

5. Unlike the EKU and Southern bonds, the SIU bond did not contain any notice provision. Moreover, although the SIU bond incorporated the Wallace's–SIU contract, the contract requires only that either party provide notice and an opportunity to cure to the other party.

### D. Wallace's/Katz–EKU Settlement

We turn now to the bankruptcy court's approval of the settlement agreement between Wallace's/Katz and EKU, which Lyndon argues was an abuse of that court's discretion. In approving settlements, bankruptcy courts must ensure that the settlement is "fair and equitable." *Reynolds v. Comm'r of Internal Revenue*, 861 F.2d 469, 473 (6th Cir.1988).

Lyndon asserts that the bankruptcy court mischaracterized the January payment as a preference under 11 U.S.C. § 547. A preference under 11 U.S.C. § 547(b) provides that "the trustee may avoid any transfer of an interest of the debtor in property

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

    (A) on or within 90 days before the date of the filing of the petition; or

    (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

    (A) the case were a case under chapter 7 of this title;

    (B) the transfer had not been made; and

    (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Lyndon does not contest that the January payment met the first four elements of a preference; however, Lyndon makes two arguments as to why the payment should not be considered a preference.

Lyndon first argues that the January payment was not a preference because Wallace's received new value. 11 U.S.C. § 547(c)(1) prohibits a trustee from avoiding a preferential transfer to the extent that the transfer was "(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." Here, Lyndon claims that the January 2001 payment constituted payment for new value because Wallace's received EKU's forbearance on its right to terminate the contract based on Wallace's default.

■ "New value" is expressly defined in 11 U.S.C. § 547(a)(2) as "money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, *but does not include an obligation substituted for an existing obligation.*" (emphasis added). Forbearance of an existing right in exchange for money is merely the substitution of an obligation for an existing obligation; forbearance is therefore explicitly excluded from new value. *See Jones v. Soc'y Bank & Trust (In re Riggs)*, 129 B.R. 494, 496–97 (Bankr. S.D.Ohio 1991); *see also Rushton v. E & S Int'l Enters., Inc. (In re Eleva, Inc.)*, 235 B.R. 486, 489 (10th Cir.1999); *Bavely v. Merchants Nat'l Bank (In re Lario)*, 36 B.R. 582, 584 (Bankr.S.D.Ohio 1983) (finding lessor's forbearance from exercising his right to evict debtor did not constitute new value); *In re Duffy*, 3 B.R. 263, 266 (Bankr.S.D.N.Y.1980) (finding car lessor's forbearance from repossessing vehicle did not constitute new value); *United States Lines (S.A.), Inc. v. United States (In re McLean Indus., Inc.)*, 132 B.R. 247, 263 (Bankr.S.D.N.Y.1991) (finding that agreement to forbear from proceeding with a

default action pursuant to terms of mortgages did not constitute new value), *aff'd,* 162 B.R. 410 (S.D.N.Y.1993), *rev'd on other grounds,* 30 F.3d 385 (2d Cir.1994); *Wolinsky v. Central Vt. Teachers Credit Union (In re Ford),* 98 B.R. 669, 683–84 (Bankr.D.Vt.1989) (stating "[F]orbearance, whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or intentional/unintentional, may not constitute new value under § 547(a)(2) for § 547(c)(4) purposes."). Lyndon's argument that the payment conferred new value on Wallace's therefore fails.

■ Lyndon's second argument is that the January payment fails to meet the required element that the creditor receiving the transfer received "more than such creditor would receive" in a hypothetical Chapter 7 case. 11 U.S.C. § 547(b)(5). For purposes of determining whether a creditor received more than it would have received in a Chapter 7 liquidation, this court looks at the liquidation value of the debtor's assets at the time the bankruptcy petition was filed. *Still v. Rossville Bank (In re Chattanooga Wholesale Antiques, Inc.),* 930 F.2d 458, 465 (6th Cir.1991). "Unless the estate is sufficient to provide a 100% distribution, any unsecured creditor ... who receives a payment during the preference period is in a position to receive more than it would have received under a Chapter 7 liquidation." *Id.* In this case, at the time of the filing, Wallace's assets were not sufficient to provide 100% distribution to its unsecured creditors.

Lyndon claims that EKU still did not receive more than it would have received in hypothetical Chapter 7 because EKU was a net debtor, not a net creditor, of Wallace's as of the petition date. Thus, according to Lyndon, the January payment merely decreased dollar for dollar the amount that EKU could setoff its own obligations to Wallace's, but did not allow EKU to receive more than it would have in

Chapter 7. This argument depends, however, on the validity of the setoff principle and the presupposition that EKU owed Wallace's the value of the bookstore inventory and the unamortized capital improvements that were eventually paid for by B & N. Because EKU did not owe Wallace's the value of the inventory and improvements, EKU was a net creditor and Lyndon's argument fails. The bankruptcy court did not abuse its discretion in approving the settlement.

### III.

For the foregoing reasons, we affirm the bankruptcy court's orders.